ſL JUDGE KOELTL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

18 CV 3738

| | |
|---|---|
| [UNDER SEAL], | Civil Action No.: |
| Plaintiffs, | COMPLAINT |
| v. | FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) |
| [UNDER SEAL], | |
| Defendants. | JURY TRIAL DEMANDED |

LEVINE & BLIT, PLLC
Matthew J. Blit
*Attorneys for Qui Tam Plaintiff*
350 Fifth Avenue, Suite 4020
New York, NY 10118
(212) 967-3000
mblit@levineblit.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA; and THE STATES OF NEW YORK and NEW JERSEY, EX REL. WILLIAM HYMAN,<br><br>Plaintiffs,<br><br>v.<br><br>ABIRA MEDICAL LABORATORIES, LLC d/b/a GENESIS DIAGNOSTICS, ALAN MILLER, and ABE MILLER,<br><br>Defendants. | Civil Action No.:<br><br>FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)<br><br>JURY TRIAL DEMANDED |

**QUI TAM FALSE CLAIMS ACT COMPLAINT**

# MATTER FILED UNDER SEAL

# DO NOT FILE ON PACER

**RELATOR'S COMPLAINT PURSUANT TO**
**THE FEDERAL CLAIMS ACT, 31 U.S.C. § 3729 *ET SEQ.***
**AND PENDENT STATE FALSE CLAIMS ACTS**

WILLIAM HYMAN on behalf of the United States of America, the State of New York, and the State of New Jersey, brings this action for violations of the federal False Claims Act (the "FCA"), 31 U.S.C. §§ 3729–3733, and the federal Anti-Kickback Statute (the "AKS"), 42 U.S.C. § 1320a-7(b), the New York False Claims Act ("NYFCA"), N.Y. Fin. Law § 189.1(a) and (b), and the New Jersey False Claims Act ("NJFCA"), N.J. Rev. Stat. § 2A:32C-3(a) and (b), to recover all damages, civil penalties, and all other recoveries provided for under the above-referenced statutes.

## I. INTRODUCTION

This *qui tam* action alleges violations of the FCA, the AKS, and analogous state statutes, related to the clinical laboratory testing scheme carried out by Defendants Abira Medical Laboratories, LLC d/b/a Genesis Diagnostics ("Genesis"), Alan Miller, and Abraham Miller. Defendant Genesis provides illegal financial inducements to physicians and phlebotomists in exchange for referrals of patients for laboratory testing. Defendant Genesis's financial relationships with referring physicians and phlebotomists violate federal and state anti-kickback statutes, and analogous state laws prohibiting physician self-referrals. Much of the laboratory testing referred to Genesis is also not medically necessary. Defendant Genesis conspires with sales and marketing independent contractors to violate the FCA and analogous state statutes by facilitating such independent contractors' offers of illegal inducements to physicians and phlebotomists and the referral of patients by physicians and phlebotomists to Genesis. Defendant Genesis violates the AKS Relator also brings this action against the owners of

Genesis, Alan Miller and Abe Miller, for their roles in directing and supervising the fraudulent conduct.

Qui Tam Plaintiff ("Relator") Hyman, through their legal counsel, Levine & Blit, PLLC, bring this action on their behalf, and on behalf of the United States of America and the States of New York, and New Jersey, (hereinafter "the Government"). These States, along with the United States, are hereafter collectively referred to as the "Government."

1. This is an action to recover monetary damages and civil penalties on behalf of the United States of America and the States of New York and New Jersey, New York, arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used, or presented by Defendant Genesis ("the Corporate Defendant"), and/or their agents, predecessors, successors, and employees, including Defendants Alan Miller and Abe Miller ("the Individual Defendants") in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended ("the federal FCA"). This action also arises under the false claims acts of the States of New York and New Jersey.

2. Defendant Genesis is a nationwide provider of clinical laboratory testing services. Many of the patients receiving its services are beneficiaries of myriad Government programs, including but not limited to the Medicare, TRICARE/CHAMPUS, numerous Medicaid programs, and other state-funded healthcare programs. A significant number of patients receiving these services are insured by myriad private insurers, including patients who are residents of New Jersey and New York.

3. Defendants' unlawful scheme is wide reaching but straightforward. Defendant Genesis, under the supervision of its owners, Defendants Alan Miller and Abe Miller, are

involved in activities that violate the FCA, the AKS, and/or corresponding state statutes relative to Medicare and Medicaid Part B service provider claims made, to wit:

a. Billings made for medically unnecessary procedures and testing services through the pervasive use of standing orders, labeled "Customized Test Profiles" by Genesis. Genesis placed immense pressure on its sales and marketing representatives to obtain signatures from physicians on standing order forms.

b. Billings made for medically unnecessary procedures and testing services through the automatic confirmation testing of all specimen samples and their initial test results.

c. Remunerations given to physicians to induce referrals for laboratory testing services, including but not limited to the placement of Genesis phlebotomists, referred to as "collectors," at physicians' offices at no cost to the referring physician to collect specimen samples to be tested by Genesis and perform other tasks and duties not related to the collection of specimen samples; and the provision of high speed lines, printers, computers, and label printers to physicians at no cost to the referring physician.

d. Billings made for medical procedures and testing services solicited from and performed on patients by Genesis-placed phlebotomists without a physician's consultation, direction, or approval.

e. Remunerations given to Genesis phlebotomists placed at referring physicians' offices in the form of "wages" based on the volume of referrals (per specimen basis) made to Genesis. If the phlebotomist fails to satisfy a referral quota, Genesis reduces the phlebotomist's hourly wage and the number of hours

worked, incentivizing the phlebotomist to make referrals, regardless of their medical necessity.

f. Remunerations given to Genesis independent contractors, working as sales and marketing representatives, labeled as a "performance bonus" but were and are in substance volume-based commissions determined by the volume of referrals made by physicians to Genesis as a percentage of Genesis's total receivables.

g. Remunerations given by Genesis's owners and/or directors to physicians to induce referrals for laboratory testing services in the form of event tickets, such as concerts and sporting events.

4. Genesis performs urine drugs testing ("UDT"), which, used appropriately, informs physicians of the amount of a particular substance (be it a prescription drug such as oxycodone or an illicit substance such as heroin) in a patient's system. Since its founding, Genesis has knowingly submitted many millions of dollars' worth of false claims to the Medicare program for urine drugs tests that were not reasonable and necessary or that were furnished pursuant to prohibited referrals that resulted from Genesis's improper financial relationships with physicians, in violation of the physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law"), and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

5. Genesis used a variety of schemes to cause physicians, including many of its biggest referrers, to routinely order excessive amounts of UDT for all patients (including Medicare and Medicaid patients) regardless of individual patient assessment or need. Genesis's abusive practices included the use of physician standing order forms (called "Custom Profiles") to encourage routine, excessive UDT, and the dissemination of false and misleading statements

about drug abuse rates and the value of its testing. Genesis also provided many services and benefits to physician customers (including free staffing and free supplies, as discussed below) contingent on referrals of certain amount of tests to Genesis.

6. As Genesis knew, Medicare only covers tests that are reasonable and necessary for the treatment or diagnosis of an individual patient's illness or injury, based on his or her medical condition. 42 U.S.C. § 1395y(a)(1)(A). The need for *each test* for *each patient* must be individually assessed and documented in the patient's medical chart. 42 C.F.R. §§ 410.32(a), (d)(2). Many patients, including those with chronic pain, do not need extensive laboratory-based UDT. Genesis nonetheless sought to, and did, cause many physicians to routinely order extensive and expensive UDT for all of their patients in order to make more money. Genesis then billed Medicare for each drug or drug class tested—averaging more than seventeen procedure codes (many with multiple units) per urine sample—including tests for drugs that patients were not suspected of taking, and for "confirmatory" quantitative tests of expected in-office test results.

7. Genesis also paid illegal kickbacks to physicians in the form of free phlebotomist and/or collector office staffing services and point-of-care ("POC") drug test cups to induce physicians to make referrals to Genesis. The staffing service was paid for by Genesis (hourly wage). These POC test cups cost about $5–6 each and Genesis have physicians more than one million of them in exchange for referrals. Genesis's provision of the free staffing and cups was tied to its excessive testing scheme: its executives required that, to be eligible to receive free staffing and POC test cups, physicians have Custom Profiles (i.e., standing orders) with at least a certain number of drug tests. Genesis's provision of free staffing and POC test cups generates

more than a certain number of referrals for Medicare patients, which resulted in Genesis receiving tainted Medicare reimbursements.

8. Genesis was warned by consultants, customers, competitors, insurers, and regulators that its marketing schemes were illegal. Genesis nonetheless pressured its sales force into participating in these schemes by fostering a culture of greed, intimidation, and intense sales pressure.

9. Through its practices, Genesis knowingly submitted many thousands of false and fraudulent claims to Medicare and New York/New Jersey Medicaid for excessive and unnecessary testing, and for testing referred in violation of the Stark Law and the Anti-Kickback Statute, and was improperly paid many millions of dollars in reimbursement for these claims.

10. Since its founding, Defendant Genesis has exclusively employed independent contractors as sales and marketing agents ("Genesis representatives"). Under the direction of Defendants Alan Miller and Abe Miller, Genesis representatives promote Genesis services to physicians, including lucrative offers to pay sham "processing fees" to referring physicians.

11. Physicians have referred and continue to refer patients to Genesis in exchange for these inducements.

12. One purpose of the inducements offered by Defendants is to obtain referrals from targeted physicians. Therefore, all claims submitted to Government healthcare programs or to private insurers in New Jersey, and New York by Genesis that are tainted by the fraudulent kickback scheme are false claims.

13. The fees paid by Genesis to referring physicians greatly exceed fair market value of any services performed by referring physicians. Also, compensation paid by Genesis to physicians is based on the volume of referrals.

14. Pursuant to a "Services Agreement" between Genesis and Genesis representatives, Genesis compensates such sales and marketing independent contractors, in part, with commissions based upon the volume of physician referrals made to Genesis on a per specimen basis.

15. The commissions paid by Genesis to Genesis representatives (35% multiplied by the number of specimens referred) is based on the volume of referrals.

16. Defendants violate the federal FCA by submitting or causing the submission of claims for laboratory testing tainted by their fraudulent conduct, and by creating false or fraudulent records material to false claims.

17. Defendants have further violated the FCAs of the States of New Jersey, and New York, in the same manner they violated the federal FCA.

18. In addition, Defendants have violated federal and state FCAs by conspiring to submit or cause the submission of false claims by Defendant Genesis for these illegally induced laboratory tests to state healthcare programs, including Medicare, and by conspiring to create or use false records material to the false and fraudulent claims for laboratory testing services submitted by Defendant Genesis to state health care programs, including Medicare.

19. Having submitted, or caused the submission of, these false claims to federal and state health care programs, Defendant Genesis violated the federal and state FCAs by failing to return to state and federal government healthcare programs overpayments associated with illegally obtained state and federal funds.

20. The Defendants' national scheme caused further damage to Government healthcare programs, in addition to the reimbursements for the illegally induced, and in many cases, medically unnecessary tests themselves. The Defendants' scheme caused beneficiaries of

Government healthcare programs and private insurance plans in New Jersey, and New York to receive other unnecessary healthcare, including follow-up physician visits, follow-up testing, and unnecessary medications related to the illegal referrals to Genesis.

21. Defendants have entered into illegal arrangements with physicians that provide financial incentives for the use of their laboratory services, resulting in medically unnecessary testing that is then billed to private insurers.

22. Defendants have entered into illegal arrangements with Genesis representatives that provide compensation in the form of commissions based upon the volume of referral services on a per specimen basis.

23. The Defendants' operations extend across the United States, and the Defendants' scheme is national in scope. Defendants' Genesis representatives, as the marketing agents for Genesis, operate wherever Genesis does business nationwide.

24. Relator has observed the scheme employed by the Defendants operating in the office of Saleem Mahmood, MD, a customer of Defendant Genesis.

25. Relator has observed the scheme employed by the Defendants operating in the office of Dr. Papert, MD, a customer of Defendant Genesis.

26. Relator has observed the scheme employed by the Defendants operating in the office of Dr. Pvulovic, MD, a customer of Defendant Genesis.

27. Genesis's owners, Defendants Alan Miller and Abe Miller, and the Genesis representatives promoted the Genesis inducements to Dr. Mahmood, Dr. Papert, and Dr. Pvulovic. The owners of Genesis, Defendants Alan Miller and Abe Miller, employed Genesis nationwide marketing practices that centered on offering physicians inducements in exchange for

patient referrals and on offering Genesis representatives inducements in exchange for patient referrals.

## II. JURISDICTION AND VENUE

28. This action arises under the laws of the United States of America to redress violations of the federal FCA, 31 U.S.C. § 3729 *et seq.* Defendants do business in the Southern District of New York and throughout the United States. The acts proscribed by 31 U.S.C. §3729(a) and described in this *qui tam* complaint occurred in the Southern District of New York and elsewhere in the United States.

29. Subject-matter jurisdiction over this *qui tam* action is conferred by 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3732(a) and 3730(b). Relator is an "original source" and otherwise authorized to maintain this action in the name of the United States and as contemplated by the Civil False Claims Act, 31 U.S.C. §§ 3729–33, and in the name of the other Plaintiff states.

30. Relator has made the necessary voluntary disclosures to the Government prior to the filing of this lawsuit and has filed all documents necessary with the United States Government as required by 31 U.S.C. § 3730(b)(2).

31. The Court has jurisdiction over Defendants' violations of the false claims statutes of the States of New Jersey, New York, as well as the NJIFPA and NYIFPA, pursuant to 31 U.S.C. § 3732(b), because Defendants' violations of these states acts and their violations of the federal FCA arise from the same transactions or occurrences.

32. There has been no public disclosure of the "allegations or transactions" in this Complaint under Section 3730(e) of the federal FCA or under analogous provisions of the named state FCAs. The specific facts, circumstances, and allegations of the Defendants' violations of

the federal and state False Claims Acts and the NJIFPA, and NYIFPA have not been publicly disclosed in a civil suit or administrative civil money penalty proceedings in which the Government is already a party. Relator, moreover, would qualify as an "original source" of the allegations in this Qui Tam Complaint under 31 U.S.C. § 3730(e) of the federal FCA, and under provisions of relevant state FCAs and the NJIFPA, and NYIFPA, even had such public disclosure occurred.

33. The Court has personal jurisdiction over all of the Defendants because 31 U.S.C. § 3732(a) authorizes nationwide service of process, and because the Defendants have minimum contacts with the United States, and can be found in, transact or have transacted, business in the Southern District of New York.

34. Defendants regularly perform healthcare services in and submit or cause the submission of thousand of claims for payment to federal and state health care programs, including but not limited to Medicare and Medicaid, and accordingly, are subject to the jurisdiction of this Court.

35. Venue lies under 28 U.S.C. § 1391(b), (c) and 31 U.S.C. § 3732(a) because the Southern District of New York is a district in which any one Defendant can be found or transacts business, and an act proscribed by 31 U.S.C. § 3729 occurred within this district.

36. The Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over the causes of action brought under the laws of the States of New Jersey and New York, for the recovery of funds paid by a State Government or by a private insurer because these arise from the same facts forming the basis of the action brought under 31 U.S.C. § 3730.

## III. THE PARTIES

### A. Relator Hyman

37. Qui Tam Relator William Hyman ("Relator Hyman") is an individual residing in Upper Saddle River, New Jersey.

38. From about early 2014 until October 2016, Relator Hyman provided sales and marketing services for Defendants. During this time, Relator Hyman learned of Defendants' efforts to provide inducements to physicians and phlebotomists, as well as Defendants' patient referral and billing practices, including billings to government healthcare programs and private insurers for patient blood draws for clinical laboratory testing.

39. Relator Hyman has direct and independent knowledge of the factual allegations contained in this Qui Tam Complaint, and Relator Hyman brings this action as an "original source," as that term is defined by the state and federal governments' false claims acts.

### B. Defendants Genesis, Alan Miller, and Abe Miller

40. Abraham Miller and Alan Miller (the "Millers") are the co-owners of Genesis, and they are each officers and/or directors at Genesis.

## IV. BACKGROUND ON FEDERAL AND STATE HEALTH PROGRAMS

### A. The Medicare Program

#### 1. Medicare Payments: Only Medically Necessary Services

41. In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for: (1) people age sixty-five (65) or older; (2) people under age sixty-five (65) with certain disabilities; and (3) people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

42. Medicare has four parts: Part A (Hospital Insurance); Part B (Medical Insurance); Part C (Managed Care Plans); and Part D (Prescription Drug Program).

43. Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including critical access hospitals and skilled nursing facilities (but not custodial or long-term care). Medicare Part A also helps cover hospice care and some home health care.

44. Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care, including emergency care. Part B helps pay for covered health services and supplies when they are medically necessary. Over the last fifty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

45. Medicare Part D (Prescription Drug Plan) provides beneficiaries with assistance in paying for out-patient prescription drugs. Under Medicare Part D, Medicare beneficiaries must affirmatively enroll in one of many hundreds of Part D plans ("Part D Sponsors") offered by private companies that contract with the federal government. Part D Sponsors are charged with and responsible for accepting Medicare Part D prescription claims, determining coverage, and making payments from the Medicare Part D funds.

46. Payments from the Medicare Program come from a trust fund—known as the Medicare Trust Fund—which is funded through payroll deductions taken from the work force, in addition to government contributions. Over the last fifty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers through the United States.

47. The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid

Services ("CMS"), an agency of HHS. Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government (particularly CMS).

48. Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "carriers" or "Medicare Administrative Contractors" ("MACS") to handle payment for physicians' services in specific geographic areas. These private insurance companies, or "Medicare Carriers," are charged with and responsible for accepting Medicare claims, determining coverage and making payments from the Medicare Trust Fund. Laboratory testing provided on an out-patient basis is typically covered through Medicare Part B.

49. The principal function of Medicare intermediaries and carriers is to pay the claims of Medicare providers, and to audit such claims to ensure that providers follow the strictures of the Medicare Program.

50. Section 1862(a)(1)(A) of the Social Security Act provides that Medicare payment may not be made for services that are not reasonable and necessary. To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent, they are medically necessary. Medicare will only reimburse costs for medical services that are needed for the prevention, diagnosis, or treatment of a specific illness or injury.

51. As a condition for Medicare payment, a physician must certify the necessity of the services and, in some instances, recertify the continued need for those services. *See* Sections 1814(a)(2) and 1835(a)(2) of the Social Security Act; *see also* 42 C.F.R. § 424.10. In order for the federal government to cover Medicare Part A, Medicare Part B, or a Medicare Part C plan to provide coverage, all care must be "medically necessary."

52. Medical care is "medically necessary" when it is ordered or prescribed by a licensed physician or other authorized medical provider, and Medicare (or a Medicare Part C plan) agrees that the care is necessary and proper. Services or supplies that are needed for the diagnosis or treatment of a medical condition must meet the standards of good medical practice in the local area.

### 2. Medicare Only Pays for Medically Necessary Clinical Laboratory Testing

53. Medicare Part B pays for clinical laboratory testing performed by companies such as Defendant Genesis. This independent laboratory performs testing on specimens (also known as "samples") from patients referred to the "independent" laboratory by their physician.

54. As a condition of payment by Medicare, diagnostic laboratory tests must be ordered by a physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem. The physician must also use the results in the management of the beneficiary's specific medical problem. 42 C.F.R. § 410.32(a).

55. Medicare does not cover purely prophylactic lipid testing (lipid screening).

56. The physician who orders clinical laboratory services "must maintain documentation of medical necessity in the beneficiary's medical record." 42 C.F.R. § 410.32(d)(2).

### 3. Independent Laboratory Bills Medicare for Testing Services

57. The majority of laboratory testing services are paid by Medicare on a fee-for-service ("FFS") basis. Medicare pays for most outpatient clinical laboratory services based on the Clinical Laboratory Fee Schedule in accordance with Section 1833(b) of the Social Security Act. The Medicare payment to the laboratory is the lesser of the laboratory's actual charge, the

local fee for a geographic area, or a national limit. In accordance with the Social Security Act, national limits are set at a percent of the median of all local fee schedule amounts for each laboratory test code. Each year, fees are updated for inflation based on the percentage change in the Consumer Price Index. However, legislation by Congress can modify the update to the fees. Therefore, under the Clinical Laboratory Fee Schedule, the amount paid to the lab is usually the National Limitation Amount (NLA). Medicare Claims Processing Manual [Pub. 100-4] Chapter 16, Section 20. The Clinical Laboratory Fee Schedule is updated annually.

58. The clinical laboratory that provides the testing services bills the Government health programs directly, including Medicare. Medicare Part B pays approximately 80% of the Medicare-approved amount for these testing services.

59. The laboratory bills Medicare from the location the test is performed.

60. A clinical laboratory must accept assignment of the Medicare beneficiary's benefit to receive Part B payment for laboratory tests based on the Laboratory Fee Schedule. Medicare Claims Processing Manual, Chapter 16 – Laboratory Services, Section 30.1 – Mandatory Assignment for Laboratory Tests. Therefore, Medicare Part B deductible and coinsurance (co-payments) do not apply to laboratory services provided by a physician or by an independent laboratory. Medicare Claims Processing Manual, Chapter 16 – Laboratory Services, Section 30.3 – Method of Payment for Clinical Laboratory Tests – Place of Service Variation.

61. The clinical laboratory submitting the claim to a federal healthcare program must maintain documentation it receives from the ordering physician, as well as documentation that the information that the lab submitted with the claim accurately reflects the information it received from the ordering physician or non-physician practitioner. 42 C.F.R. § 410.32(d)(2)(ii).

62. During claims review, CMS may deny claims by laboratories where documentation provided does not demonstrate that the service is reasonable and necessary, or where the providers fail to provide documentation requested to establish medical necessity. 42 C.F.R. §410.32(d)(3)(ii).

63. The entity submitting the claim may request from the referring physician additional diagnostic and other medical information to document that the services it bills are reasonable and necessary. If the entity requests additional documentation, it must request material relevant to the medical necessity of the specific test(s). 42 C.F.R. § 401.32(d)(3)(iii).

64. If a physician requests an independent laboratory to obtain specimens in situations which do not meet, or without regard to whether they meet, the medical necessity criteria in Chapter 15 of the Medicare Benefit Policy Manual, an educational contact with the prescribing physician is warranted and, where necessary, corroborating documentation should be obtained on claims until the carrier is assured that the physician prescribes such services only when the criteria are met. Medicare Claims Processing Manual, Chapter 16 – Laboratory Services, Section 60.2.

**4. <u>Limits on Medicare Payments for Blood Draws (Venipuncture)</u>**

65. In addition to payment for the laboratory testing service itself, CMS may make a separate payment to providers for collection of the specimen. Medicare reimburses medical providers a specimen collection fee for drawing a blood sample through venipuncture (i.e., inserting into a vein a needle with syringe or vacutainer to draw the specimen) or collecting a urine sample by cathertization. Medicare Claims Processing Manual, Chapter 16 – Laboratory Services, Section 60.1.

#### a. <u>**Medicare Pays for Blood Draws (Venipuncture) by a Physician**</u>

66. Medicare reimburses a physician for a blood specimen collection (venipuncture) only when (1) it is the accepted and prevailing practice among physicians in the locality to make separate charges for drawing or collecting a specimen, and (2) it is the customary practice of the physician performing such services to bill separate charges for drawing or collecting the specimen. Medicare Claims Processing Manual, Chapter 16 – Laboratory Services, Section 60.1.1 – Physician Specimen Drawing, (Rev. 1, 10-01-03).

67. A physician who performs the blood draws on their own patients for blood samples that are then sent to independent laboratories reports the services with HCPCS Code 36415, "collection of venous blood by venipucture."

#### b. <u>**Medicare Pays for Blood Draws (Venipuncture) by a Clinical Laboratory**</u>

68. Medicare allows separate charges by laboratories drawing blood, whether or not the blood is referred to a hospital or independent laboratory. Medicare Claims Processing Manual, Chapter 16 – Laboratory Services, Section 60.1.2 – Independent Laboratory Specimen Drawing (Rev. 1, 10-01-03).

69. Medicare does not pay the collection ("blood draw") fee to anyone who has not actually extracted the specimen. In addition, only one collection fee is allowed for each type of specimen per patient encounter, regardless of the number of specimens (*i.e.*, vials of blood) drawn. Medicare Claims Processing Manual, Chapter 16 – Laboratory Services, Section 60.1.

70. Medicare does not pay for routine handling of blood samples referred by one laboratory to another. *See* Medicare Claims Processing Manual, Chapter 16 – Laboratory Services, Section 60.1.2. – Independent Laboratory Specimen Drawing (Rev. 1, 10-01-03).

**B. The Medicaid Program**

71. Medicaid is the state-federal funded program for low income children and families, the elderly, and people with severe disabilities. Congress created Medicaid in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act.

72. Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

73. Medicaid is a cooperate federal-state public assistance program which is administered by the states. The Centers for Medicare and Medicaid Services ("CMS") is the federal agency that administers the Medicaid program, and requires all states to provide certain mandatory services. However, because states must also provide funding for their Medicaid program, each state chooses several optional services they wish to provide in addition to the mandatory Medicaid services.

74. Funding for Medicaid is shared between the Federal Government and those state Governments that choose to participate in the program. Federal support for Medicaid is substantial, often exceeding 50% of state Medicaid program funding.

75. Title XIX of the Social Security Act allows considerable flexibility within the States' Medicaid plans and, therefore, specific Medicaid coverage and eligibility guidelines vary by state.

**1. Medicaid Programs Pay for Necessary Clinical Laboratory Testing**

76. Like the Medicare Program, Medicaid only covers health services or supplies, including laboratory testing, that are necessary for the diagnosis or treatment of a medical condition, in keeping with the standards of good medical practice in the local area. While

Medicaid reimbursement for laboratory testing varies by state, there is generally a requirement that the testing is medically necessary.

#### 2. Medicaid Coverage for Blood Draws (Venipuncture)

77. Like Medicare, state Medicaid programs also permit a physician to bill for venipuncture when the physician's office actually draws blood samples to be sent to independent clinical laboratories for testing.

### C. Other Government-Funded Health Care Programs Pay for Laboratory Tests

#### 1. TRICARE/CHAMPUS and other Healthcare Benefits

78. In addition to Medicare and Medicaid, the federal government reimburses a portion of the cost of laboratory testing services under several other federal health care programs, including but not limited to TRICARE/CHAMPUS, CHAMPVA, and the Federal Employees Health Benefit Program ("FEHBP").

79. CHAMPUS/TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. It offers families a choice of three options: (1) TRICARE Prime; (2) TRICARE Extra; and (3) TRICARE Standard (formerly known as CHAMPUS (Civilian Health & Medical Program for Uniformed Services)), a health care plan for military dependents and retirees operated by the DoD.

80. CHAMPVA, administered by the United States Department of Veteran Affairs, is a health care program for the families of veterans with a 100% service-connected disability.

81. The FEHBP, administered by the United States Office of Personnel Management, provides health insurance for hundreds of thousands of federal employees, retirees, and survivors.

82. Like Medicare, TRICARE and other federal healthcare benefit programs cover only medically necessary inpatient and outpatient care. TRICARE defines medically necessary care as services or supplies provided by a hospital, physician, and/or other provider for the prevention, diagnosis, and treatment of an illness, when those services or supplies are determined to be consistent with the condition, illness, or injury; provided in accordance with approved and generally accepted medical or surgical practice; not primarily for the convenience of the patient, the physician, or other providers; and not exceeding (duration or intensity) the level of care, which is needed to provide safe, adequate, and appropriate diagnosis and treatments.

83. TRICARE always requires a referral and/or prescription from the member's primary care physician (PCP) for treatment, including laboratory tests.

### 2. Private Insurance Pays for Medically Necessary Laboratory Tests

84. Private insurance plans also pay for laboratory testing provided by Defendant Genesis. Upon information and belief, the contracts for those private insurers whose patients are drawn into the Defendants' referral scheme mirror the Medicare and Medicaid requirements by mandating that laboratory testing billed to private insurers is not the result of an illegal inducement, and is medically necessary.

## V. THE APPLICABLE LAW

### A. The Federal False Claims Act—Overview

85. Title 31 U.S.C.A. section 3729 of the Federal False Claims Act provides as follows:

> (a) Liability for Certain Acts -
> (1) IN GENERAL – Subject to paragraph (2), any person who –
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;
(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government, and intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;
(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or
(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 not; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

**B. <u>The Federal Anti-Kickback Statute</u>**

86. Enacted in 1972, the federal Anti-Kickback Statute, 42 U.S.C. § 13207b(b), protects patients and federal healthcare programs from fraud and abuse by curtailing the corrupting influence of money on healthcare decisions. When a company pays kickbacks to a physician to induce them to use the company's products or services, it fundamentally compromises the integrity of the physician-patient relationship. Government-funded healthcare programs, such as Medicare and Medicaid, rely upon physicians to decide what treatment is appropriate and medically necessary, and therefore payable by such healthcare program.

87. The federal Anti-Kickback Statute makes it a crime to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce a person: (1) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or (2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program. 42 U.S.C. § 1320a-7b(b)(1) and (2).

88. A violation of the federal Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. Any party convicted under the federal Anti-Kickback Statute must be excluded (*i.e.*, not allowed to bill for any services rendered) from Federal health care programs for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1).

89. The term "remuneration" encompasses anything of value, in cash or in-kind, directly or indirectly, covertly or overtly. 42 U.S.C. § 1320a-7b(b)(1).

90. The Anti-Kickback Statute has been interpreted by the majority of federal courts to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. *United States v. Grebe*, 760 F.2d 68, 69 (3d Cir. 1985) (holding that the Anti-Kickback Statute is violated if "one purpose of the payment was to induce future referrals . . . even if the payments were also intended to compensate for professional services."); *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989) (adopting the holding in *Greber*); *see also Feldstein v. Nash Comm. Health Servs.*, 51 F. Supp. 2d 673 (E.D.N.C. 1999) (recognizing that the Medicare fraud statute is violated if "one purpose of the payment was to induce future referrals," and citing *Kats* and *Greber*).

91. Proof of an explicit quid pro quo is not required to show a violation of the Anti-Kickback Statute.

92. The United States Department of Health & Human Services ("HHS") has published "safe harbor" regulations that define practices not subject to the Anti-Kickback Statute because such practices are unlikely to result in fraud or abuse. 42 C.F.R. § 1001.952. The safe harbors set forth specific conditions that, if met, assure entities involved of not being prosecuted or sanctioned for the arrangement qualifying for the safe harbor. However, safe harbor

protection is only afforded to those arrangements that precisely meet all of the conditions set forth in the safe harbor. As further explained herein, none of the practices at issue in this *Qui Tam* Complaint meet these safe harbor regulations.

93. Compliance with the Anti-Kickback Statute is a *condition of payment* under Government healthcare programs, including the Medicare and Medicaid programs, and that condition applies regardless of whether the kickback payor or recipient is submitting the claim to the Government. Claims that arise from a kickback scheme are per se false, and violate the False Claims Act, because they are the result of a kickback—no further express or implied false statement is required to render such infected or tainted claims false, and none can wash the claim clean.

94. On March 23, 2010, as part of the Patient Protection and Affordable Care Act, Pub. Law 111-148 ("PPACA"), the Anti-Kickback Statute was amended to explicitly provide that a claim resulting from a violation of the Anti-Kickback Statute is a violation of the federal False Claims Act. Specifically, the federal AKS was amended by adding subsection (g) to 42 U.S.C. § 1320a-7b. 42 U.S.C. § 1320a-7b(g), which states that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31, United States Code."

95. In addition, section 6402(a) of the PPACA established section 1128J(d) in the Social Security Act regarding reporting and returning Medicare and Medicaid overpayments. Section 1128J(a) requires a person who has received an overpayment to report and return the overpayment by the later of (i) sixty (60) days after the overpayment was identified or (ii) the date any corresponding cost report is due. The knowing and improper failure to return an

overpayment subjects the recipient to liability under the federal False Claims Act, 31 U.S.C. § 3730(a)(1)(G).

### 1. HHS-OIG: Fraud Alert on Lab Services and Tainted Referrals

96. The Office of Inspector General (OIG) has issued fraud alerts on clinical laboratory services. OIG has noted that:

> Many physicians and other health care providers rely on the services of outside laboratories to which they may refer high volumes of patient specimens every day. The quality, timeliness and cost of these services are of obvious concern to Medicare and Medicaid patients and to the programs that finance their health care services. Since the physician, not the patient, generally selects the clinical laboratory, it is essential that the physician's decision regarding where to refer specimens is based only on the best interests of the patient.

OIG Special Fraud Alert: Arrangements for the Provision of Clinical Lab Services (Issued October 1994), https://oig.hhs.gov/fraud/docs/alertandbulletins/121994.html.

97. Likewise, "whenever a referral source solicits or receives anything of value from the laboratory," the same inference (that the thing of value is offered to induce the referral of business) may be made. By "fair market value" OIG means "value for general commercial purposes," which "must reflect an arm's length transaction which has not been adjusted to include the additional value which one or both of the parties has attributed to the referral of business between them." OIG Special Fraud Alert: Arrangements for the Provision of Clinical Lab Services (Issued October 1994), https://oig.hhs.gov/fraud/docs/alertandbulletins/121994.html.

98. OIG has issued a Special Fraud Alert regarding kickbacks associated with a lab that provides phlebotomy services to referring physicians. In particular, OIG has noted:

- When permitted by State law, a laboratory may make available to a physician's office a phlebotomist who collects specimens from patients for testing by the outside laboratory.

- While the mere placement of a laboratory employee in the physician's office would not necessarily serve as an inducement prohibited by the anti-kickback statute, the statute is implicated when the phlebotomist performs additional tasks that are normally the responsibility of the physician's office staff.
- In such a case, the physician, the phlebotomist, and the laboratory may have exposure under the anti-kickback statute.

OIG Special Fraud Alert: Arrangements for the Provision of Clinical Lab Services (Issued October 1994), https://oig.hhs.gov/fraud/docs/alertandbulletins/121994.

## VI. ALLEGATIONS: DEFENDANTS PROVIDE INDUCEMENTS FOR PATIENT REFERRALS FOR LABORATORY TESTS

### A. Overview of Genesis's Operations

99. Prior to 2014, Defendant Genesis began its operations and started processing blood and urine samples.

#### 1. Genesis's Operations: Sales Force

100. Defendant Genesis employs its own sales force. Genesis sales representatives promote Genesis products and services to physicians and physician practices throughout the country.

101. Genesis sales representatives as misclassified as independent contractors and are compensated pursuant to a Independent Contractor Agreement.

102. Defendant Genesis, through its representatives, including Relator Hyman, also provides on-going customer service. These customer service activities include providing marketing information about Genesis services, coordinating the delivery of Genesis supplies to facilitate referrals, and facilitating payments.

## VII. DEFENDANT GENESIS'S NATIONAL SCHEME

### A. Genesis's Sales Force Delivers the Genesis Promotions: Fees for Patient Referrals

#### 1. The National Scope of Genesis's Scheme

103. Upon information and belief, the founders and owners of Defendant Genesis, Defendants Alan Miller and Abe Miller collaborated to develop a nationwide marketing program for Genesis.

104. Relator Hyman alleges, upon information and belief, that Genesis's offer to hire and place a phlebotomist and/or collector in account physicians' offices at no cost to the referring physicians was approved by Genesis as part of the marketing program delivered by Genesis sales representatives to all potential Genesis customers nationwide.

105. Upon information and belief, Defendant Genesis's sales representatives offered the same staffing and hardware requests (the "inducements") to many physicians to induce them to refer patients to Defendant Genesis for laboratory testing.

106. In the summer of 2015, Genesis's Hyman provided Dr. Mahmood with Genesis's marketing materials, including a page of suggested ICD-9 codes. These same Genesis marketing materials and suggested ICD-9 codes for Genesis's tests are distributed by Genesis representatives from Florida to Pennsylvania.

### B. Genesis Grants Physician Referrals in Many States

107. The sales territory served by the Genesis sales representative Hyman while he worked at Genesis was New Jersey and New York.

108. Since at least early 2014, Defendant Genesis, its principals, and agents have marketed Genesis testing services in many states, including: Florida, New Jersey, New York, Pennsylvania, and Texas.

109. In addition to Dr. Mahmood, many physician-customers from across the United States stopped referring patients to other laboratories after Genesis started promoting its testing.

110. Upon information and belief, Defendant Genesis's sales representatives offered the same staffing and hardware inducements they offered to Dr. Mahmood to many physicians across the United States, including former customers as well as new targets, to induce them to refer patients to Defendant Genesis for laboratory testing.

111. Upon information and belief, since at least early 2014, Genesis has made monthly staffing payments to many, if not all, phlebotomists and/or collectors placed in the offices of referring physicians. Genesis pays the phlebotomists and/or collectors between $18 and $25 per hour based upon the number of patients referrals made to Genesis for testing.

### 1. Genesis Markets Staffing and Hardware Inducements in Many States

112. Upon information and belief, Defendant Genesis and Defendants Alan Miller and Abe Miller developed a program for marketing Genesis's testing services. Defendant Genesis has marketed its laboratory testing services in ever-expanding geographic areas.

113. Dr. Mahmood is one of many physicians in Genesis's New Jersey territory. Based on the marketing of Genesis's representatives, Dr. Mahmood began to refer patients to Genesis in mid-2015.

114. Thereafter, Genesis began making significant monthly cash payments to a phlebotomist placed in Dr. Mahmood's office. Genesis called these payments "wages," which

were calculated at between $18 and $25 depending on the number of patients referred to Genesis by Dr. Mahmood.

115. As stated above, Hyman, one of the Genesis sales representatives, promoted Genesis products and services in New Jersey and New York. These materials included the Genesis new customer form. Genesis has provided a space on the new customer form for the sales representative to request that a phlebotomist and/or collector be hired by Genesis and placed in the new physician's office.

116. Upon information and belief, the inclusion of the "staffing" and "hardware" requests on the Genesis new customer form supports the conclusion that Genesis pays the phlebotomist fees/wages for referring physicians on an hourly wage, and that Genesis marketing agents offer these staffing and hardware arrangements to prospective new customers in exchange for patient referrals.

117. Relator alleges upon information and belief that many physicians in New Jersey, New York, and Pennsylvania, and other states received the same promotional offer from Defendant Genesis that was made to Dr. Mahmood.

118. Relator alleges upon information and belief that the marketing program vetted and approved by Genesis and its owners, Defendants Alan Miller and Abe Miller, for potential customers in all states covered by Genesis marketing efforts included Genesis's offer of a staff placement and hardware request at no expense to the physician for making patient referrals.

119. Upon information and belief, Defendant Genesis's sales representatives conveyed to physicians across the country Genesis's offer to place such staff and provide such hardware for the physician to refer a patient to Defendant Genesis for laboratory testing.

120. Relator alleges upon information and belief that Defendant Genesis has received referrals from physicians receiving bogus "staffing" and/or "hardware" requests from Genesis. Relator further alleges upon information and belief that Defendant Genesis has submitted claims for these tainted and unnecessary testing services to Government healthcare programs.

121. Upon information and belief, physicians in many states who refer patients to Genesis receive substantial remuneration from Genesis based on national marketing schemes vetted and approved by Defendants Alan Miller and Abe Miller and carried out by Defendant Genesis's sales force. These marketing schemes have resulted in Genesis submitting many claims for tainted and unnecessary laboratory testing services to Government healthcare programs.

122. Relator alleges upon information and belief that Genesis's sales representatives target physicians who do not have the ability to have patient blood drawn in their offices because if the patient is sent to a hospital lab or other laboratory outside the doctor's office, all of the "staffing" would be done there. Genesis would then have no justification for the bogus "staffing" request that is free to the physician to induce referrals.

123. Relator alleges upon information and belief, that Genesis's offer of volume-based commission "bonuses" to its sales representatives whose physician accounts made patient referrals to Geensis was approved by Genesis as part of the marketing program delivered by Genesis/Vernon to all potential Genesis sales representatives nationwide.

124. Genesis provides for volume-based commissions as compensation for its sales repesentatives.

125. Upon information and belief, Defendant Genesis offered the same cash inducements to many sales representatives (in addition to Relator Hyman) to induce them to

cause or arrange for the referral of patients from physician accounts to Defendant Genesis for laboratory testing. For example, Relator alleges upon information and belief that many sales representatives in New Jersey, New York (including the Southern District of New York), Florida, Texas, and Pennsylvania received the same volume-based commission offer, namely Genesis's offer of inducements that Defendant Genesis made to Relator Hyman.

126. In the summer of 2015, Genesis's Relator Hyman provided Dr. Mahmood with Genesis's marketing materials, including a page of suggested ICD-9 codes. These same marketing materials and suggested ICD-9 codes for Genesis's test are distributed by Genesis representatives from Florida to Pennsylvania.

127. Relator alleges upon information and belief, that Defendant Genesis's national marketing practices, as promoted by Genesis's sales representatives, resulted in many sales representatives (who were misclassified as independent contractors) receiving a 35% volume-based commission for each time a patient's specimen is referred to Genesis.

128. Relator alleges upon information and belief that, utilizing this model, Defendants implemented a marketing program which resulted in illegal inducements being paid to sales representatives for causing or arranging for the physician referral of patients.

129. The national scope of Genesis's inducement scheme is also supportive by Genesis's owners, who have stated that Genesis's business practices include obtaining W-9 forms from physicians as they become new customers. This W-9 form is necessary for Genesis to issue 1099 forms reflecting the compensation arrangement that Genesis has with many sales representatives throughout the United States. Genesis pays independent contractor sales representatives nationwide for volume-based commissions based on a per specimen referral basis.

## VII. CAUSES OF ACTION AGAINST DEFENDANTS

### A. First Cause of Action - Violations of the FCA

130. Relator Hyman hereby repeats and realleges each allegation contained in paragraphs numbered 1 through 129, as if fully set forth herein.

131. Pursuant to the acts and practices alleged herein, Defendants made a claim(s), or made a statement(s) in order to get the Government to pay money on a claim.

132. Pursuant to the acts and practices alleged herein, the claim(s) or statement(s) made was false or fraudulent.

133. Pursuant to the acts and practices alleged herein, Defendants knew that the claim(s) or statement(s) was false or fraudulent.

134. The Government, unaware of the falsity of the claim(s) and statement(s), paid or continues to pay the claims that are non-payable due to Defendants' unlawful practices.

135. Due to Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

### B. Second Cause of Action - Violations of the AKS

136. Relator Hyman hereby repeats and realleges each allegation contained in paragraphs numbered 1 through 135, as if fully set forth herein.

137. Pursuant to the acts and practices alleged herein, Defendants knowingly and willfully offered and paid remuneration to persons or entities in return for referring an individual needing medical services to a person or entity for items or services payable by federal health care programs.

138. The Government, unaware of the kickback scheme(s) in place, paid or continues to pay the claims that are non-payable due to Defendants' unlawful practices.

139. Due to Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**C. Third Cause of Action – Violations of the NYFCA**

140. Relator Hyman hereby repeats and realleges each allegation contained in paragraphs numbered 1 through 139, as if fully set forth herein.

141. Pursuant to the acts and practices alleged herein, Defendants made a claim(s), or made a statement(s) in order to get the State of New York to pay money on a claim.

142. Pursuant to the acts and practices alleged herein, the claim(s) or statement(s) made was false or fraudulent.

143. Pursuant to the acts and practices alleged herein, Defendants knew that the claim(s) or statement(s) was false or fraudulent.

144. The State of New York, unaware of the falsity of the claim(s) and statement(s), paid or continues to pay the claims that are non-payable due to Defendants' unlawful practices.

145. Due to Defendants' acts, the State of New York has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

**C. Fourth Cause of Action – Violations of the NJFCA**

146. Relator Hyman hereby repeats and realleges each allegation contained in paragraphs numbered 1 through 145, as if fully set forth herein.

147. Pursuant to the acts and practices alleged herein, Defendants made a claim(s), or made a statement(s) in order to get the State of New Jersey to pay money on a claim.

148. Pursuant to the acts and practices alleged herein, the claim(s) or statement(s) made was false or fraudulent.

149. Pursuant to the acts and practices alleged herein, Defendants knew that the claim(s) or statement(s) was false or fraudulent.

150. The State of New Jersey, unaware of the falsity of the claim(s) and statement(s), paid or continues to pay the claims that are non-payable due to Defendants' unlawful practices.

151. Due to Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, *qui tam* plaintiff prays for a judgment against Defendants as follows:

1. that Defendants cease and desist from violation the FCA, AKS, and equivalent state statutes;

2. that this Court enter a judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3. that this Court enter a judgment against Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained because of Defendants' actions, plus a civil penalties for each violation of N.J. Stat. Ann. § 2A:32C-3(a) and (b);

4. that this Court enter a judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of Defendants' actions, plus a civil penalties of $12,000 for each violation of N.Y. Fin. Law § 189.1;

5. that *qui tam* plaintiff be awarded the maximum amount allowed pursuant to § 3730(d) of the FCA, and the equivalent provisions of the state statutes set forth above;

6. that *qui tam* plaintiff be awarded all costs of this action, including attorney's fees and expenses; and

7. that all plaintiffs records such other relief as this Court deems just and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, *qui tam* plaintiff demands a trial by jury in this action.

Dated: April 05, 2018
New York, New York

LEVINE & BLIT, PLLC

Matthew J. Blit
*Attorneys for Qui Tam Plaintiff*
350 Fifth Avenue, Suite 4020
New York, NY 10118
(212) 967-3000
mblit@levineblit.com